**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TIMOTHY HOFFSTEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21 C 4335 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD COPRORATION | ) | |
| D/B/A METRA | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Timothy Hoffstead seeks damages from Defendant Northeast Illinois Regional
Commuter Railroad Corporation ("Metra"), his former employer, alleging discrimination and
constructive discharge in violation of Title I of the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12112.  Metra moves for summary judgment on all counts.  Because no reasonable
factfinder could find that Metra took adverse employment actions against Hoffstead because of
his disability, or that a reasonable employee would view Hoffstead's working conditions as
unbearable, the Court grants Metra's motion for summary judgment.

## BACKGROUND[1]

### I.     Hoffstead's experience as a Metra police officer

In 2010, Metra hired Hoffstead as a police officer assigned to the Consolidated Control
Facility. As a member of Metra's police force, Hoffstead was a member of a collective

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts, Doc.
64, to which the parties did not raise any objections.  The Court has considered the supporting exhibits
and included in this background section only those portions of the statements and responses that are
appropriately presented, supported, and relevant to resolution of the pending motion for summary

bargaining unit called the Metropolitan Alliance of Police ("MAP").  MAP has a collective

bargaining agreement ("CBA") with Metra.

After four years, Hoffstead earned a position as a certified explosive detection dog

handler, which he held in addition to his role as a field training officer.  Metra built its explosive

detection dog handler program in partnership with the Transportation Security Administration

("TSA"), which provided Metra with the dogs for the program.  TSA also trained and certified

Metra's officers, including Hoffstead.  Commander Brian Mack oversaw the explosive detection

dog handlers and served as the contact for TSA program administrator Spencer Himes.

After Hoffstead completed three months of training and received his certification with

TSA, Metra assigned Hoffstead to work with "JD," a canine trained in explosive detection.

Hoffstead worked with JD for four years, including housing and caring for JD outside of work

hours.

Hoffstead received higher pay and a Metra police vehicle as part of his position as dog

handler.  He also did not have to report to a specific starting location and did not have specific

assignments.  Hoffstead's superiors Mack and Chief Joseph Perez, the Chief of the Metra Police

Department, noted that Hoffstead demonstrated above average performance and did a good job

with tasks he received based on reports from his supervisors.

## II.     Metra's Drug and Alcohol Policy

Metra maintains a Drug and Alcohol Policy ("D&A Policy") that its employees must

follow.  Rule G of the D&A Policy prohibits employees' drug and alcohol use while on duty,

with one exception: "the use of prescribed medication, which has been disclosed to Metra's

Medical Department or designated medical physician, and has been approved for use at the

---

judgment.  The Court takes all facts in the light most favorable to Hoffstead, the non-movant.  *See Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).

dosage prescribed given the employee's responsibility." Doc. 64 ¶ 48. Nicole Lang served as Metra's Medical Department Manager in 2018. Her responsibilities included administering Metra's Drug and Alcohol program, tracking employee physicals, removing employees from service for testing positive on a drug and alcohol test, notifying departments when an employee cleared the requirements of the D&A Policy, and notifying departments when an employee received medical clearance to return to work.

In 2018, Metra did not employ physicians capable of running and certifying the drug tests. Instead, it hired a third-party, Concentra, to provide various medical services for Metra employees including reviewing and certifying drug tests.[2] Concentra supplied Medical Review Officers ("MRO") to perform these tasks. Concentra also provided Metra with information about which medications employees could safely take during work hours and helped Metra's Medical Department evaluate whether an employee could safely work while taking medication.

### III. Hoffstead's positive drug test

Hoffstead requires prescription medication to treat several different medical conditions—Adderall and Concerta for his ADD, and Narco for his migraines and a wrist injury. Hoffstead previously disclosed his prescription for Concerta in March 2013 and Norco in April 2014 to Metra's Medical Department by submitting On-Duty Use of Medication Forms. He received approval for both medications. On March 30, 2018, Hoffstead again submitted both an updated physical and On-Duty Use of Medication Form to Metra's Medical Department that listed Norco,

---

[2] Metra, likewise, hired a third party drug testing lab to administer the drug tests.

Adderall, and Concerta prescriptions. Metra again approved his prescriptions. Only Metra's Medical Services Department had access to Hoffstead's forms.

On July 24, 2018, several months after Hoffstead submitted his updated physical and On-Duty Use of Medication Form, Metra ordered Hoffstead to take a random drug test. During the test, Hoffstead told the technician that he took Adderall for his ADD and expected to test positive for amphetamines.

On August 1, 2018, the Concentra MRO, Dr. Scott Feldman, reviewed Hoffstead's results. Hoffstead's drug test indicated a positive test for amphetamine, hydrocodone, and hydromorphone. The D&A Policy provides the following procedure for when an employee tests positive in a drug test:

> "If the lab results of a drug test are positive or otherwise non-negative (e.g., adulterated, substituted), the MRO will contact the employee to provide the employee the opportunity to provide an explanation as to why the test was positive or otherwise non-negative. If the MRO determines that there is no legitimate medical explanation for the presence of any controlled substance, and that there is no reason to question the scientific sufficiency of the results, the MRO will verify the test result."

Doc. 64-35 at 24. Under the D&A Policy, a prescription medication provides a legitimate medical explanation if the employee provides medical evidence of the valid prescription. The MRO cannot consider an On-Duty Use of Medication Form as medical evidence because employees self-report their medications on those forms. In compliance with the D&A Policy, Dr. Feldman attempted to contact Hoffstead three times to determine if Hoffstead had a legitimate explanation, such as a valid prescription, to justify the positive test results. Dr. Feldman did not hear from Hoffstead within 48 hours of the positive result. On August 3, Dr.

4

Feldman reported the positive test result to Metra, explaining "positive due to no contact with donor within 48 hours." Doc. 64 ¶ 70.

Following his positive test result, on August 3, 2018, Hoffstead received an order to report to the Blue Island Police Office where he met with Commander Brian Windle and Lieutenant Ross Fuller. During this meeting, Windle and Fuller removed Hoffstead from service "while the department investigate[d] an allege case involving a 'Rule G violation' discovered during [Hoffstead's] drug testing." Doc. 64 ¶ 72. Hoffstead explained to Windle and Fuller that his positive tests resulted from his prescriptions for Narco and Adderall. Windle instructed Hoffstead to return JD to the department. Windle also presented Hoffstead with several forms: a Rule G-By-Pass Agreement, a letter removing him from service and placing him on unpaid leave, a waiver to his right to an investigation,[3] and an Election to Participate in the Rule G Rehabilitation Education Program ("R/E Program"). Doc. 64 ¶ 73. Metra offers the R/E Program to individuals who qualify for the "Prevention Program Companion Agreement." As described by the D&A policy:

> Under the Companion Agreement arrangement, an employee dismissed for a violation of Rule G, wherein no other significant rule infraction has occurred, may retain an employment relationship with Metra by voluntarily electing to participate in a course of counseling, education and/or treatment as set forth by the SAP/DAC. Once choosing to participate in the treatment program, the employee will remain in the status of a dismissed employee until such time as favorable recommendation is made by the SAP/DAC that the employee has successfully completed the recommended course of counseling, education and/or treatment. Return to service is also conditioned upon successful completion of a return-to-duty drug and alcohol test. A return-to-work medical evaluation is also required.

Doc. 64-35 at 31–2. Hoffstead signed the waiver and executed the Election to Participate in the Rule G Rehabilitation Education program after he talked to Mack over the phone later that evening. Doc. 64 ¶¶ 79–80. After Hoffstead signed the waiver, Metra reported Hoffstead to the

---

[3] One of Hoffstead's rights under the CBA includes a right to investigation prior to being disciplined.

Illinois Law Enforcement Training and Standards Board ("ILETSB"), pursuant to its obligation to report a willful violation of a department policy. ILETSB did not decertify Hoffstead.

On August 8, several days after Metra removed Hoffstead from service, Hoffstead emailed photocopies of his prescription bottles for his medication to Perez and Dr. Feldman. After receiving the proper medical evidence from Hoffstead, Dr. Feldman changed the results of Hoffstead's drug test to negative. Perez subsequently emailed Lang to inform her that Dr. Feldman reversed Hoffstead's test results.

On August 17, Hoffstead held his initial assessment with the R/E program. Hoffstead completed the R/E program on August 23 and the return-to-work medical evaluation and drug and alcohol screening on August 27. On September 7, Lang notified Perez, Deputy Chief Paul Riggio and others that she cleared Hoffstead to return to service.

## IV. Metra's application process for the open certified explosive detection dog handler position

On August 3, the same day that Windle and Fuller met with Hoffstead following his positive drug test, Mack contacted Himes to inform him that Metra removed Hoffstead from service. Himes informed Mack TSA would recall JD if he remained out of service for more than 30 days. Himes asked Mack how long Hoffstead would be out of service, and Mack responded, "his return to work, if ever, was unknown." Doc. 64 ¶ 89. Himes advised Mack to select an officer to fill the vacated handler position.

Metra posted a handler position on September 5, 2018. It needed to select an officer to fill the position by October 17, 2018. Perez, Riggio, and Sergeant Lionel Major participated in the selection process and provided their recommendation to Windle. Mack could review any memorandum Perez, Riggio, and Major prepared for Windle. Sixteen applicants applied, none of whom had previously received training to be a certified explosive detection dog handler. On

September 13, Perez, Riggio and Major recommended its new handler—Officer Michael Long. Long had been a Metra officer for less than two years and did not have prior experience as a certified explosive detection dog handler. The following day, Perez emailed Mack that Long would fill the certified explosive detection dog handler position.

Hoffstead learned of the certified explosive detection dog handler opening through his MAP representative, Joe Kresch. On September 13, Kresch submitted an application on Hoffstead's behalf for the handler position to Riggio. However, the application that Kresch submitted to Riggio differed from the version that Hoffstead provided to Kresch.

Perez received Hoffstead's application on September 19. Perez did not think that Hoffstead qualified for the handler position because believed that ILETSB had decertified Hoffstead after his positive drug test. After reviewing Hoffstead's application, Perez sent an email to others at Metra, including Riggio and Lang, expressing his concern that Hoffstead may not be able to perform the duties of a police officer and wondering if the application provided evidence of impairment from Hoffstead's prescriptions.

## V.     Hoffstead's Attempts to Assert Seniority and Eventual Departure from Metra

On September 17, after Metra filled the vacant dog handler position, Metra notified Hoffstead he could return to work and exercise his seniority to place himself in a patrolman position. Rule 13 of the CBA outlines the process for an officer asserting his seniority over a position. It explains that an officer must assert his seniority by declaring intent and actually occupying and performing service in the position within seven days of "after the date affected." Doc. 64 ¶ 30. Failure to meet the seven-day requirement allows Metra to furlough the employee.

On September 17, Hoffstead made his first attempt to assert his seniority. Metra denied it on September 19, finding Hoffstead failed to comply with the terms of the CBA. Hoffstead

made his second attempt on September 22, which Metra initially accepted but then rejected because Hoffstead failed to physically appear to displace the junior officer. Hoffstead's third attempt on September 26 failed because seven days had passed since his return to work. Subsequently, Metra furloughed Hoffstead.

Two days later, Metra posted a patrolman position at Metra's Blue Island Headquarters. Hoffstead applied for and received the position. He returned to work on October 10, 2018. Metra paid Hoffstead the patrolman rate of pay plus the differential for being a certified field training officer. Shortly after returning to work, Hoffstead applied for FMLA leave for his migraine headaches. Metra approved his application for leave.

In his position as patrolman, Hoffstead did not receive access to run license plates through the "Bullet" system. However, at that time, Metra PD required patrolman to call Cook County Police dispatch, not an internal system, to run license plate numbers. Hoffstead did not have access to the biometric timekeeping system but could still clock in and out of his shifts. Hoffstead also never received all of his keys to open other departments.

Hoffstead worked for Blue Island from October 10 through December 2, 2018, when Metra abolished the Blue Island position. Hoffstead then worked as a patrolman out of Metra's Western Avenue Facility until he resigned on February 26, 2019 to take a full-time position at the Genoa Police Department.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to

8

interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle*, 719 F.3d at 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.      Disability Discrimination

The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). When evaluating a claim for disability discrimination, "[i]t is essential for the plaintiff to link the adverse action with his disability." *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020). To survive summary judgment,

"a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the but for reason for the adverse action." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). One method of evaluating causation is the burden shifting framework created by *McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973). But "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). The Seventh Circuit provided another framework for evaluating discrimination claims in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Under the *Ortiz* framework, the Court considers "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *see Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 686–87 (N.D. Ill. 2017) (applying *Ortiz* to ADA claims). Because Hoffstead does not employ the *McDonnell Douglas* burden shifting framework, but instead chooses to pursue the *Ortiz* approach, the Court does the same and considers whether the evidence, taken as a whole, would permit a reasonable factfinder to conclude that Metra's actions against Hoffstead occurred because of his disabilities. *See Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020) (applying *Ortiz* instead of *McDonnell Douglas* where the plaintiff sought review under *Ortiz*).

Hoffstead offers four different adverse actions separate from his constructive discharge that he claims occurred because Metra discriminated against him due to his disability— Hoffstead's removal from service and enrollment in the R/E program; Metra's decision not to award Hoffstead the open certified explosive detection dog handler position; Metra's

10

requirement that Hoffstead return JD; and Metra's denial of Hoffstead's exercise of his seniority rights.  Metra moves for summary judgement against all Hoffstead's claims.

### A. Removing Hoffstead from service and enrolling him in the R/E Program

Hoffstead asserts that Metra removed him from his position as a certified explosive detection dog handler following his positive drug test because of his disability.  Metra argues that Hoffstead's suspension cannot constitute an adverse action because it did not know that he had a disability and because it removed Hoffstead from his position after he failed to follow proper procedure, namely not providing the MRO with his medication information after his failed drug test.

Courts recognize "the well-established principle that an employee cannot hold an employer liable under the ADA if the employer has no knowledge of the employee's disability." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014).  Courts look to whether the employer's decisionmaker with respect to the adverse action had knowledge of the plaintiff's disability.  *See Green v. Pace Suburban Bus*, No. 02 C 3031, 2004 WL 1574246, at *5 (N.D. Ill. July 12, 2004) ("because Plaintiff has identified Heelan as 'the person who decided to fire Green,' Heelan therefore is the operative decisionmaker, and Green must demonstrate that Heelan regarded or perceived the IDC to substantially limit Green's proffered major life activities.).

A reasonable juror could find that Metra's decisionmakers had knowledge of Hoffstead's disabilities in advance of his drug test.  The parties agree that Nicole Lang served as the decisionmaker with respect to Hoffstead's suspension for his positive drug test.[4]  Doc. 64 ¶ 10.

---

[4] Metra argued that other managers in the police department did not have knowledge of Hoffstead's condition because it did not have access to his medical paperwork and because the evidence does not show that it actually saw his information.  The Court finds that Hoffstead provided enough evidence that a reasonable juror could conclude that Hoffstead's supervisors knew of his disability.  Specifically, Mack

Lang's responsibilities included tracking employee physicals, which include On-the-Job Medication Forms. In March 2018, only a few months before his random drug test, Hoffstead submitted forms listing his various prescriptions to Metra's Medical Department who, in partnership with Concentra, reviewed and approved employee prescription use. Doc. 64 ¶ 54. Hoffstead received permission from Metra in March 2018 after submitting his physical to use his various prescriptions under the condition that he would not use Norco within eight hours prior to working or driving. A reasonable jury could infer that Lang, as a manager within Metra's Medical Department, had knowledge of Hoffstead's prescriptions, which he took to address his disabilities, before his random drug test. *C.f. Otero v. Indiana Harbor Belt R.R. Co.*, No. 19 C 396, 2023 WL 2631383, at *12 (N.D. Ind. Mar. 24, 2023) (finding courts must consider what an employer knew at the time of the adverse action).

Although Hoffstead can show a material issue of fact with respect to Metra's knowledge, his claim still fails because he cannot show that Metra's decision to suspend him was discriminatory. Instead, the evidence reflects that Metra removed Hoffstead from his position because he failed to contact the MRO following his failed drug test, resulting in the certification of a positive drug test and his subsequent Rule G violation.

---

testified that Hoffstead said he had ADD, *see* Doc. 64 ¶ 18. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) ("Of course, if an employee tells his employer that he has a disability, the employer then knows of the disability, and the ADA's further requirements bind the employer."). Hoffstead testified that he told Vanderwond, Grabowski, and Major about his migraines (Doc. 64 ¶ 25). *Carlson v. Sexton Ford Sales, Inc.,* No. 415-CV-04227, 2017 WL 4273618, at *11 (C.D. Ill. Sept. 26, 2017) (noting that because some of the managers knew about the Carlson's disabilities provided sufficient basis to determine that a jury could find Sexton had awareness of Carlson's condition). Similarly, Hoffstead emailed a copy of his prescriptions to Perez on August 8, meaning he had knowledge of Hoffstead's required prescriptions when he took any actions after that date. Taking the facts in the light most favorable to Hoffstead, the Court finds that he has establish knowledge of his disability among relevant decision makers at the police station.

Although Hoffstead rejects Metra's premise that he violated Rule G because he had prior approval from Metra to take his prescriptions, the evidence runs counter this position. Viewing the evidence in the light most favorable to Hoffstead, he cannot show that Metra did more than act according to its policies when an officer tests positive for drugs. *Deacon v. Peninsula Chicago, LLC*, No. 16 C 1464, 2017 WL 3531518, at *12 (N.D. Ill. Aug. 17, 2017) (granting summary judgment where "Plaintiff failed to comply with Defendant's policies, and he therefore was not meeting his employer's legitimate expectations.") (collecting cases). As Dr. Feldman testified, the MROs require evidence from a doctor to validate an employee's prescription. Doc. 64 ¶ 60. The documentation that Hoffstead provided to Metra in advance of his drug examination consisted of self-reported prescription documentation, which did not comply with this requirement. *Id*. The parties do not dispute that Dr. Feldman reached out to Hoffstead three times over the course of 48 hours; that he did not connect with Hoffstead; or that Hoffstead did not provide Dr. Feldman with proper documentation before Dr. Feldman reported a positive test. *Id.* ¶ 70. Further, that Dr. Feldman changed the results of Hoffstead's positive drug test after Hoffstead provided copies of his prescriptions underscores his adherence to the D&A Policy that the employee must provide proof of prescription from a doctor. *Id.* ¶ 81. No reasonable juror could conclude that Metra suspended Hoffstead pending his completion of the D&E program after his positive drug test because of his disability; instead, the evidence establishes that Hoffstead's removal occurred because the MRO could not verify his prescriptions due to his failure to respond to Dr. Feldman's requests. *Ross v. FedEx Freight*, No. 20 C 642, 2021 WL 4288321, at *11 (S.D. Ind. Sept. 21, 2021) (granting summary judgment for disability discrimination claim finding the plaintiff was fired for violating FedEx policy and DOT

regulations by failing to provide a letter from a proscribing physician verifying his prescription for opioids).

### B.  Metra's refusal to rehired Hoffstead as a certified explosive detection dog handler

Hoffstead also alleges that Metra's decision to hire Office Long for the certified explosive detection dog handler open position instead of rehiring him constitutes an adverse action.  Hoffstead highlights the suspicious timing of his clearance to return to work—ten days after Lang cleared him to return and three days after Metra chose its new dog handler—as evidence that Metra treated him adversely because of his disabilities.  Alone, Hoffstead's delay in returning to work does not establish causation.  *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) ("Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment."); *c.f. Malkowski v. Cleveland Corp.*, No. 18 C 5829, 2021 WL 5769534, at *15 (N.D. Ill. Dec. 6, 2021) ("Suspicious timing isn't always enough, but suspicious-timing-plus can get a plaintiff over the summary judgment hurdle.").

The record does not provide additional corroborating evidence that Metra decided to hire Long over Hoffstead because of Hoffstead's disability.  Instead, the evidence reflects that Perez did not consider Hoffstead for the open dog handler position because Perez believed that ILETSB automatically decertified Hoffstead after he tested positive on his drug test, and that Hoffstead knew Perez held that belief.  *See* Doc. 64-8 at 52:8–14 (Perez testified that he believed Hoffstead was automatically decertified); Doc. 64-1 at 227:9–14 (Hoffstead testified to learning from Kresch that Perez believed Hoffstead had been decertified).  Hoffstead argues Perez's explanation functioned as pretext because ILETSB never removed his certification.  "[A] pretext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness."

*Seymour-Reed v. Forest Pres. Dist. of DuPage Cnty*, 752 F. App'x 331, 335 (7th Cir. 2018).

Hoffstead cannot rely solely on the fact that Perez incorrectly believed that ILETSB decertified

Hoffstead because "[p]retext requires more than a showing that the decision was mistaken, ill-

considered or foolish." *Nawrot v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002). "[S]o long as

[the employer] honestly believed those reasons, pretext has not been shown." *Id.* (citing *Jordan*

*v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

Hoffstead points to Perez's September 19 email to support his pretext argument. In the

email, Perez raises doubts as to Hoffstead's fitness for duty due to spelling and grammatical

errors in his application, which he attributed to impairments from Hoffstead's prescriptions.

Doc. 64 ¶ 98. But Perez only received Hoffstead's application after Long had already been

chosen for the dog handler position, so Perez could not have been influenced by the application

or have reached the conclusion that the application might act as "evidence of impairment from

[Hoffstead's] prescriptions" when Long received the job offer. Doc. 69-9 at Ex. 14. *See*

*McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995) ("The employer could not

have been motivated by knowledge it did not have and it cannot now claim that the employee

was fired for the nondiscriminatory reason."); *Otero*, 2023 WL 2631383, at *12 (finding courts

must consider what an employer knew at the time of the adverse action). Additionally, Perez

starts the email with the fact that "Hoffstead was reinstated as a police officer by the Illinois Law

Enforcement Standards Board on 9/17," Doc. 69-9 at Ex. 14, reiterating Perez's belief that

Hoffstead had been decertified at the time he offered Long the dog handler position. Given the

broader context of the email, the Court does not find Perez's belief that Hoffstead could not qualify for the position because he was decertified to be pretext. *See Nawrot,* 277 F.3d at 906.

Finally, Hoffstead asserts that Metra treated a similarly situated employee, Long, more preferably than Hoffstead because of Hoffstead's disabilities. A similarly situated employee "must be directly comparable to the plaintiff in all material respects." *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (citations omitted). "In general, a plaintiff who believes another individual is similarly situated must at least show that this comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014). The Court must also consider whether the similarly situated employees "engaged in comparable rule or policy violations." *Patterson*, 589 F.3d at 365–66 (citing *Jordan v. City of Gary, Ind.,* 396 F.3d 825, 834 (7th Cir. 2005)).

Hoffstead argues Long qualifies as a similarly situated employee because they both worked at the police station and the same Chief and Deputy Chief supervised them. He notes that the same CBA and D&A policy applied to both him and Officer Long. However, Hoffstead does not provide any evidence that Officer Long also violated Rule G or the D&A Policy more broadly. *Patterson*, 589 F.3d at 365 ("To the extent, however, that Coffey is claiming that Ryerson would have permitted someone who did not share her religious views to remain in the editorial department notwithstanding repeated violations of company rules, the argument is folded into the fourth element of her prima facie case."). Officer Long, therefore, is not similarly

situated to Hoffstead. Accordingly, Hoffstead's disability discrimination claims fail as to Metra's decision not to hire him for the open dog handler position.

### C. Reassigning Hoffstead's Assigned Dog

Hoffstead points to Metra's reassignment of his canine partner, JD, as a third adverse action. But Hoffstead cannot show that Metra took JD from Hoffstead because of his disability. Rather, the record reflects that Metra acted consistent with its internal policy. *Deacon*, 2017 WL 3531518, at *12 ("Plaintiff's dispute with Defendant's interpretation of its policy and with Defendant's decisions based on that policy, without more, does not lead to the inference that his termination was based on his disabilities."). TSA provided JD to Metra through the Metra Explosive Detection Canine program. As part of the program, TSA requires their canines to be in service and mandates their return if they are out of service for more than 30 days. Doc. 64 ¶ 89. When Mack informed Himes of Hoffstead's removal from service in August after his positive drug test, Himes instructed Mack to select a new officer to fill the open canine position to avoid having to return JD to TSA.

Hoffstead emphasizes Mack's comment to Himes that he did not know when Hoffstead would return to work, but he fails to explain how Mack's uncertainty regarding Hoffstead's return date was due to Hoffstead's disability. This is fatal to his claim. *Deacon*, 2017 WL 3531518, at *12 ("Without any evidence tending to show that Defendant was improperly motivated, Plaintiff's summary judgment arguments are supported only by speculation or conjecture that his termination was premised on his disability. This does not suffice.").

### D. Exercising Seniority Rights

Finally, Hoffstead argues that Metra's decision to require him to exercise his seniority rights under the CBA constitutes discrimination based on his disability. Hoffstead argues that

Rule 13, the CBA's seniority rule, did not apply to him because it does not cover certain circumstances, including when a covered employee returns from a Rule G violation. Metra argues Hoffstead's challenge to his seniority rights run afoul of 45 U.S.C. § 151 *et. seq* (the Railway Labor Act or "RLA"), and that this Court lacks jurisdiction to hear those claims.

The RLA governs railroads (like Metra) and airlines and provides for the "prompt and orderly settlement" of labor disputes in these industries. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 831 (7th Cir. 2014) (citing 45 U.S.C. § 151a). The RLA requires parties to adjudicate their "so-called 'minor disputes'" through arbitration before an adjustment board established by a governing CBA. *Id.* (citation omitted). Minor disputes include the "application of agreements concerning rates of pay, rules, or working conditions." *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303 (1989).

The RLA, however, does not preclude independent claims—in other words, claims that cannot be "conclusively resolved" by interpreting a CBA. *Carlson*, 758 F.3d at 832 (citing *Hawaiian Airlines*, 512 U.S. at 263, 265, 114 S.Ct. 2239). "[P]urely factual questions" about an employer's conduct or motivation do not "require[ ] a court to interpret any term of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988). Among other things, the RLA does not preclude claims involving "statutory protections against employment discrimination and retaliation." *Carlson*, 758 F.3d at 832 (the RLA does not preclude "claims based on rights with an independent basis").

Hoffstead argues that the evidence shows Metra discriminatorily applied Rule 13 against him for two reasons: Rule 13 should not have governed his return to work at all, and, if it did, Metra did not properly enforce the rule. Hoffstead points to Gauthier's testimony that Rule 13 only applies to positions that have been removed or eliminated, not when employees return from

an extended leave of absence.  Doc. 64-17 at 40:7–16, 42:11–15.  Although the parties agree on factual questions, including that Metra did not eliminate the dog handler position, Doc. 64 ¶ 32, Hoffstead's claims rely on the Court interpreting Rule 13 to determine whether it applies to Rule G violations, and whether Metra's rejections of Hoffstead's attempts to assert his seniority complied with Rule 13, *Simms v. Ne. Ill. Reg'l Commuter R.R.*, 860 F. Supp. 2d 609, 614 (N.D. Ill. 2012) (finding the RLA preempted plaintiff's claim that Metra violated the CBA in violation of FMLA because whether "Metra violated the CBA still depends on an interpretation of its provisions").  The RLA bars the Court from engaging in such interpretation, and so the Court must grant summary judgment as to the incorrect application of Hoffstead's seniority rights claims.  *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 664 (7th Cir. 2001) ("Accordingly, because Brown's claim requires a potentially dispositive interpretation of the CBA's seniority provisions, we hold the RLA precludes his claim.").

## II.    Constructive Discharge

Hoffstead also brings a constructive discharge claim.  Constructive discharge occurs "when, from the standpoint of a reasonable employee, the working conditions become unbearable." *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015).  Generally, "such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin v. Fort-Rohr Motors, Inc.,* 621 F.3d 673, 679 (7th Cir. 2010) (collecting cases); *see E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 440–41 (7th

Cir. 2000) (holding the plaintiff was not constructively discharged when she had to work Thursday and Fridays when she said she was unavailable).

Hoffstead asserts that he lost several benefits after losing his position as a dog handler. Hoffstead did not receive the higher canine handler wage, lost access to his own patrol car, and no longer "enjoyed the benefits" of not having a specific starting location or specific assignments. Doc. 65 at 27. However, in his new role Hoffstead received the pay differential for being a certified field training officer to bolster his patrolman pay. Doc. 64 ¶ 109. The additional changes in his job do not arise to the unbearable working conditions required to support a constructive discharge claim. *See Grube v. Lau Indus*., Inc., 257 F.3d 723, 728 (7th Cir. 2001) (finding no constructive discharge where the plaintiff had to switch shifts where her pay remained the same); *Swidnicki v. Brunswick Corp*., 23 F. Supp. 3d 921, 937 (N.D. Ill. 2014) ("Constructive discharge typically is found only in cases involving threats of physical harm or truly outrageous emotional abuse").

Hoffstead also points to Metra's failure to provide him certain resources necessary to do his job, including keys to other train stations, access to the "Bullet" software to examine license plate data, or access to the proper biometric timekeeping software. However, the parties do not dispute that Metra did not use the Bullet system in October 2018, and that every patrolman, including Hoffstead, needed to communicate with Cook County Police dispatch instead. Doc. 64 ¶ 111; *see Bradley v. State of Ill. Dep't of Pub. Aid*, No. 98 C 4987, 2000 WL 1738344, at *2 (N.D. Ill. Nov. 21, 2000) (granting summary judgment on constructive discharge claim where "plaintiff's working conditions . . . were the same as his fellow employees engaged in the same type of work."). Similarly, Hoffstead agrees he could still clock in and out of work and that his pay remained unaffected despite not having access to the biometric timekeeping system. Doc. 64

20

¶ 112.  Taken together, the changes to Hoffstead's position do not amount to "intolerable working conditions" that would amount to a constructive discharge, so the Court grants Metra summary judgment on this claim.  *Tarpley v. City Colleges of Chicago*, 752 F. App'x 336, 349 (7th Cir. 2018).

## CONCLUSION

For the foregoing reasons, the Court grants Metra's motion for summary judgment [63]. The Court enters judgment for Metra on Hoffstead's complaint [1] and terminates the case.

Dated: November 21, 2023

SARA L. ELLIS
United States District Judge