

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 23-3420

TIMOTHY HOFFSTEAD,

*Plaintiff-Appellant,*

v.

NORTHEAST ILLINOIS REGIONAL
COMMUTER RAILROAD CORPORATION,
d/b/a METRA,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-4335 — **Sara L. Ellis**, *Judge.*

---

ARGUED OCTOBER 21, 2024 — DECIDED MARCH 20, 2025

---

Before ROVNER, SCUDDER, and LEE, *Circuit Judges*.

ROVNER, *Circuit Judge*. Timothy Hoffstead worked for Metra as a canine handler. Hoffstead requires medication to treat his attention deficit disorder ("ADD"), migraines, and a wrist injury. As a result of these medications, Hoffstead tested positive for the presence of amphetamines and opioids during a work-mandated random drug test. The medical review

officer ("MRO") in charge of reporting the test results to Metra sought an explanation for the positive test from Hoffstead, but he was unable to get in touch with Hoffstead. Hoffstead was ultimately suspended from his position at Metra due to the positive drug test and, when another canine handler position became available, Hoffstead was not considered for the position. After several failed attempts to exercise his seniority, Hoffstead returned to service with Metra before ultimately leaving Metra for other employment.

Hoffstead alleges that Metra discriminated against him following his positive drug test by forcing him to complete a rehabilitation and education program, removing him as a canine handler, refusing to consider him for the open canine handler position, and rejecting his exercises of seniority. Because Hoffstead cannot show that Metra's actions were taken because of his disability, we affirm the holding of the district court.

I.

The following facts are undisputed or, where the facts are disputed, they are recounted in the light most favorable to Hoffstead, the party against whom summary judgment was granted.

Metra hired Hoffstead in 2010. In 2014, Hoffstead began working for Metra as a canine handler with a canine partner, JD. Metra's canine program is administered in cooperation with the Transportation Security Administration ("TSA"). Although Hoffstead was a Metra employee, the TSA owned JD and would reimburse Metra for expenses associated with JD's care. Hoffstead received certain benefits for his position that other, non-canine handler officers did not receive,

including higher pay, a Metra-owned vehicle to drive to and from work, and the ability to report to work without having to report to a specific starting location. At Metra, Commander Mack oversaw the administration of the canine program. The parties agree that Hoffstead was a good Metra employee.

Hoffstead has ADD, suffers from migraines, and sustained an injury to his wrist while on duty. To treat his ADD, Hoffstead takes medically prescribed Concerta and Adderall. To treat his migraines and wrist, Hoffstead takes medically prescribed Norco.

Metra's officers, including canine handlers, are represented by the Metropolitan Alliance of Police, Chapter 267. Metra's employment policies, along with the collective bargaining agreement ("CBA"), governed Hoffstead's employment, and included Rule G, which governs and restricts Metra employees' use of drugs and alcohol. Per Rule G, employees who take prescription medications must self-report those medications to Metra through the use of the On-Duty Use of Medication Form. Hoffstead reported his prescriptions to Metra through the form, and Metra approved Hoffstead's use of all his medications with the restriction that he could not use Norco within eight hours of working. Under Metra's Drug and Alcohol policy, if Metra dismisses an employee for a Rule G violation wherein no other significant rule violation occurred, a companion agreement in the CBA permits the employee to retain his or her employment with Metra by voluntarily electing to participate in the Rehabilitation/Education Program. Separately, if an officer willfully violates department or agency policy, or engages in official misconduct or a violation of the law and is discharged by Metra, then Metra must notify the Illinois Law Enforcement Training and

Standards Board ("ILETSB"), the body responsible for the certification and decertification of law enforcement officers in Illinois.

In July 2018, Metra instructed Hoffstead to report for a random drug test. Metra contracts with an outside vendor to administer the random drug tests. When he reported for the test, Hoffstead told the test administrator that he anticipated that he would test positive for amphetamines due to his prescription medication. Hoffstead's test ultimately yielded positive results for the presence of amphetamines, hydrocodone, and hydromorphone. The MRO tasked with certifying and reporting the positive results to Metra attempted to contact Hoffstead three times in a forty-eight hour period to determine why Hoffstead's test returned positive. Hoffstead did not respond to the MRO's contact attempts, and the MRO reported the positive test to Metra on August 3, 2018.

That same day, Hoffstead's superior officers ordered him to report to the Blue Island Police Office. When he arrived, two superior officers met him. One of the officers, Commander Windle, began cursing at Hoffstead and telling him that his drug test was positive. Hoffstead explained that his test returned positive because of his prescribed medications, but Commander Windle told Hoffstead that the Metra medical department was unaware of that.

Commander Windle then presented Hoffstead with a series of documents to sign. Hoffstead became upset and asked to speak with his union representative. Commander Windle stated that Hoffstead could not speak with his union representative and that the union could not help Hoffstead "with this." Later that evening, Commander Mack called Hoffstead and assured Hoffstead that he would not lose his job if he

Case: 1:21-cv-04335 Document #: 93 Filed: 04/11/25 Page 5 of 17 PageID #:2189
Case: 23-3420     Document: 00714545836     Filed: 04/11/2025     Pages: 17

No. 23-3420                                                    5

participated in the Rehabilitation/Education program outlined in Rule G. Commander Mack also advised Hoffstead that he should contact his union lawyer, and that he could not "guide" Hoffstead. After the call, Hoffstead signed an agreement to participate in the Rehabilitation/Education program and a waiver of his right to an investigation and hearing. Despite Hoffstead's removal from service, the ILETSB did not decertify Hoffstead as a police officer.

Five days later, on August 8, 2018, Hoffstead provided the MRO and Metra's Chief, Joseph Perez, copies of his prescription medications, and the MRO revised Hoffstead's test results from positive to negative. However, Metra still required Hoffstead to complete the Rehabilitation/Education program, despite remarks from the program's substance abuse professional that the issue was "clerical."

On August 20, 2018, Commander Mack informed the TSA Field Canine Coordinator that Metra had removed Hoffstead from service. The TSA Coordinator told Commander Mack that if JD was going to be out of service for more than thirty days, Metra would need to return JD to the TSA. Commander Mack told the TSA that Hoffstead's "return to work, if ever, was unknown," that the TSA could reassign JD, and that Metra would pick a replacement canine handler by October 17, 2018.

On September 5, 2018, Metra posted a vacancy announcement for the canine handler position. The posting yielded sixteen applicants—none certified as canine handlers. Chief Perez, Deputy Chief Riggio, and Sergeant Major all participated in the selection process, and Commander Mack could review the applications (called "memorandums of interest") to give Chief Perez a recommendation about whom to hire.

On September 7, 2018, following completion of the Rehabilitation/Education program, Metra's Medical Department cleared Hoffstead to return to work. On September 13, 2018, Hoffstead submitted a memorandum of interest for the canine handler position through his union representative. Hoffstead's union representative sent the memorandum to Chief Perez's administrative assistant who forwarded the email to Deputy Chief Riggio, who is now deceased. Commander Mack did not know that Plaintiff submitted a memorandum of interest for the position.

On September 14, 2018, Deputy Chief Riggio sent an email to Commander Mack naming Michael Long, a new officer with less than two years of experience at Metra, as the officer selected for the canine handler position.

On September 17, 2018, Metra notified Hoffstead that he was eligible to return to work. On September 19, 2018, Deputy Chief Riggio forwarded Hoffstead's memorandum of interest in the canine handler position to Chief Perez. The same day, Chief Perez wrote an email to members of Metra's HR Department, Medical Department, and Labor Relations Department, as well as Deputy Chief Riggio, expressing concern that Hoffstead's memorandum of interest reflected an inability to perform the duties of a police officer, perhaps due to Hoffstead's prescription medications. The same email incorrectly stated that the ILETSB reinstated Hoffstead on September 17, 2018, even though the ILETSB never decertified Hoffstead.

Between September 18 and September 26, 2018, Hoffstead attempted to exercise his seniority three times. Metra officers exercise their seniority through the protocol outlined in Rule 13 of the CBA. Hoffstead's attempts to exercise his seniority were unsuccessful because Chief Perez stated that they did

No. 23-3420　　　　　　　　　　　　　　　　　　　　　　7

not comply with the provisions of Rule 13. On September 28, 2018, Metra posted a vacant patrolman position, which Hoffstead applied for and obtained.

After filing a charge of discrimination with the Equal Employment Opportunity Commission, Hoffstead filed suit against Metra alleging that Metra discriminated against him on the basis of his disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). The district court ultimately granted Metra's motion for summary judgment, finding that Hoffstead failed to demonstrate a reasonable dispute of material fact that his disability caused Metra's adverse actions. The district court also found that it could not consider Hoffstead's claim that Metra thwarted his exercise of seniority under the CBA because doing so would require interpretation of the CBA, and the Railway Labor Act, 45 U.S.C. § 151, *et seq.* ("RLA"), prohibits courts from interpreting CBAs. Hoffstead appeals, and we affirm.

II.

The ADA prohibits the discrimination of qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). To demonstrate a violation of the ADA, Hoffstead must show that he (1) has a disability, (2) is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation, and (3) Metra took an adverse job action because of his disability. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503–04 (7th Cir. 2017) (quoting *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016)). The parties only dispute the third element; specifically, whether Metra undertook its actions because of Hoffstead's disability.

To survive summary judgment, Hoffstead must demonstrate that a "genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action." *Monroe*, 871 F.3d at 504 (quoting *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)); *Schoper v. Bd. of Trs. of W. Ill. Univ.*, 119 F.4th 527, 534 (7th Cir. 2024).[1] When evaluating whether a genuine dispute of material fact exists, courts must consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Hoffstead argues that the district court impermissibly reviewed each piece of evidence in isolation rather than in the aggregate, as required by *Ortiz*. Hoffstead Br. at 14–15. We note at the outset that the district court cited *Ortiz* and accurately recounted its directive. *See* R. 78 at 10. But, in any event, our review of the district court is de novo. *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022). In undertaking this review, we examine the record in the light most favorable to Hoffstead, the non-moving party, and we draw all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Yahnke v. Kane County*, 823 F.3d 1066, 1070 (7th Cir. 2016). Summary judgment is appropriate only if there is no genuine dispute of material fact. Fed. R. Civ. P. 56.

Hoffstead alleges that Metra took four adverse actions against him because of his disability: 1) removing him from service and forcing him to complete the

---

[1] The parties do not advocate for an alternative standard, *see Serwatka*, 591 F.3d at 961 n.1, so we continue to apply the "but for" standard.

No. 23-3420 9

Rehabilitation/Education program; 2) removing and reassigning JD after the MRO reversed his drug test results; 3) refusing to consider him for the vacant canine handler position; and 4) requiring him to exercise his seniority rights under the CBA. We address the first three adverse actions in this section, and we address the fourth adverse action in the following section.

The first three adverse actions suffer from the same deficiency; Hoffstead cannot demonstrate that his disability was the "but for" cause of Metra's action. *Monroe*, 871 F.3d at 504. Hoffstead was not removed from service because of his diagnoses, or even because of his positive drug test. Metra removed Hoffstead from service because of a chain of events that he initiated when he did not respond to the MRO's attempts to contact him, thus causing the MRO to report Hoffstead's results as positive to Metra. And then, when confronted with the results, Hoffstead waived his right to an investigation and opted to participate in the Rehabilitation/Education program instead. R. 64 at ¶¶ 35, 79. Even though Commander Windle's statements that Hoffstead could not speak with his union representative and that the union could not help him in this situation are troubling, Hoffstead never argued to the district court that he signed these forms under duress. Therefore, this argument has been waived on appeal. *See* Hoffstead Reply Br. at 4–6; *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal."). In sum, it was Hoffstead's actions—failing to respond to the MRO and then opting to waive his right to an investigation—not Metra's actions, that led to his removal from service.

Case: 1:21-cv-04335 Document #: 93 Filed: 04/11/25 Page 10 of 17 PageID #:2194
Case: 23-3420     Document: 00714545836     Filed: 04/11/2025     Pages: 17

Hoffstead argues that he complied with Metra's policy by proactively reporting his medications. Based on the record before us, it is true that Hoffstead did comply with Metra's policy by self-reporting that he was prescribed Norco, Concerta, and Adderall through the use of the On-Duty Use of Medication Form. But Hoffstead does not dispute that self-reporting medications before a positive drug test is not a substitute for providing proof of prescriptions after a positive test. Indeed, such self-reports are not evidence of a valid prescription at the time of the positive test. *See* R. 64 at ¶ 60.

Hoffstead further argues that Metra should not have required him to finish the Rehabilitation/Education program after the MRO revised his drug test results. But Hoffstead does not point to any evidence that Metra's requirement was motivated by discrimination or that he was treated differently from other officers with Rule G violations who voluntarily opted into the Rehabilitation/Education program. Indeed, the Drug and Alcohol policy itself does not have any sort of opt-out provision for revised results, and Metra is entitled to enforce its policy to the letter. *See* Metra's Drug and Alcohol Policy, R. 64-35 at 32 ("Once choosing to participate in the treatment program, the employee will remain in the status of a dismissed employee until such time as a favorable recommendation is made by the SAP/DAC that the employee has successfully completed the recommended course of counseling, education, and/or treatment. Return to service is also conditioned upon successful completing of a return-to-duty drug and alcohol test. A return-to-work medical evaluation is also required."). Even though Metra's choice may have been inefficient or illogical to an outside observer, "[t]his Court has long championed an employer's right to make its own business

Case: 1:21-cv-04335 Document #: 93 Filed: 04/11/25 Page 11 of 17 PageID #:2195
Case: 23-3420    Document: 00714545836    Filed: 04/11/2025    Pages: 17

No. 23-3420                                                    11

decisions, even if they are wrong or bad." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999).

Hoffstead also cannot demonstrate that Metra failed to consider him for the canine handler position because of his disability. As Chief Perez testified, Hoffstead was ineligible to apply for the position because of Chief Perez's own mistaken belief that the ILETSB had decertified Hoffstead after Metra's notice to the ILETSB that Metra removed Hoffstead from service. R. 64 at ¶ 99. Hoffstead claims that Chief Perez's mistaken belief was pretextual, but he does not point to any evidence supporting that assertion. When determining whether an employer's justification is pretextual, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it offered to explain" the adverse action. *Monroe*, 871 F.3d at 505 (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)) (internal quotation marks omitted). Pretext requires more than a mistaken judgment; it requires a lie. *See id.* (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). Chief Perez's belief that the ILETSB would automatically decertify Hoffstead upon receiving notice that Metra removed him from service is not unreasonable, and Hoffstead has not given us reason to believe that Chief Perez lacked a good faith basis for his belief, particularly considering that Chief Perez repeated his mistaken belief on at least two occasions. *Green*, 197 F.3d at 900. Without a reason to question the good faith, albeit incorrect, basis for Chief Perez's belief, Hoffstead's arguments that the ILETSB never in fact decertified him are irrelevant. *Id.*

Hoffstead argues that Metra's selection of Officer Long instead of him for the canine handler position is also proof of

discrimination. But Officer Long was not similarly situated to Hoffstead such that Long's selection for the canine handler position is demonstrative of discrimination against Hoffstead. To be similarly situated, Hoffstead and Officer Long must be "directly comparable […] in all material respects." *Burks v. Wis. Dep't. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)) (internal quotation marks omitted). Indeed, Hoffstead must show that they both "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (cleaned up). Even if two employees engage in misconduct, the misconduct must be similarly egregious for the comparison to be appropriate. *Monroe*, 871 F.3d at 508–09. However, Long and Hoffstead need not be identical. Instead, the question is whether the officers are sufficiently similar to "allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Id.* (internal quotation marks omitted).

Here, there is no evidence that Metra had reason to believe that Officer Long was decertified, and that is enough to prevent meaningful comparison between the two. Indeed, Chief Perez testified that Hoffstead was not eligible to apply for the dog handler position because he was not certified at the time of his application. R. 64 at ¶ 99. As discussed *supra*, Hoffstead has not provided evidence to create a genuine dispute of material fact that Chief Perez's incorrect belief was pretextual. And moreover, Hoffstead has not provided any facts from which we might infer that Long could have been similarly disqualified and thus should have been similarly precluded from

applying for the position. Absent evidence to show that Hoffstead and Officer Long were similarly situated, Hoffstead cannot rely on the alleged difference in treatment to allege discrimination.

Chief Perez's mistaken belief also explains the delay between when Metra's Medical Department cleared Hoffstead to return to work and when Chief Perez called Hoffstead to return to work. Under Chief Perez's belief, Hoffstead was still decertified by the ILETSB on September 7, and, under Chief Perez's belief, he was not recertified until September 17, the same day Metra called Hoffstead to return to service. R. 64-9 at 77. Hoffstead has not adequately alleged that the delay was because of his disability. And the delay, without more, does not demonstrate discriminatory intent. *See Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015).

Similarly, Hoffstead cannot demonstrate that Commander Mack's statement to the TSA that he was unsure when Hoffstead would return to work and the subsequent reassignment of JD was motivated by discriminatory intent. Hoffstead argues that because the MRO had reversed Hoffstead's results before Commander Mack contacted TSA, Commander Mack's action was fueled by discrimination. Hoffstead Br. at 23. But Metra still required Hoffstead to finish the Rehabilitation/Education program including a return-to-work medical evaluation and substance screening, which he did not complete until August 27, and he was not cleared to return to work by the medical department until September 7. R. 64 at ¶¶ 83–85. Hoffstead has not pointed to any evidence that Commander Mack's belief at the time was incorrect or rooted in anything other than good faith. *Green*, 197 F.3d at 900.

Examining the evidence as a whole, Hoffstead has not demonstrated a genuine dispute of material fact that, but for his disability, Metra would not have undertaken the series of actions that it did. *Monroe*, 871 F.3d at 504; *Ortiz*, 834 F.3d at 765. Indeed, the impetus for Metra's actions was Hoffstead's failure to respond to the MRO and his choice to waive an investigation in favor of participating in the Rehabilitation/Education program.

### III.

We now turn to Hoffstead's claim that Metra discriminatorily applied the CBA's seniority rules to Hoffstead. We treat these adverse actions separately so that we may first analyze the contours of the RLA and its effect on Hoffstead's claim. Even though we find that the RLA does not preclude adjudicating Hoffstead's claim, we still find that Hoffstead's claim fails for the reasons discussed *supra*.

The RLA exists to "promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Haw. Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). It does so by requiring arbitration of certain claims, including so-called "minor disputes." *Id.* at 252–53. Minor disputes are not identified by their importance. *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 412 (7th Cir. 2021). Instead, a dispute is "minor" if its resolution requires interpretation of a CBA, or if it can be "conclusively resolved" by interpreting the CBA. *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001). This latter category includes claims that do "not involve rights that exist independent of the CBA." *Haw. Airlines*, 512 U.S. at 265. Both the source of plaintiff's claim and whether the claim requires interpretation of the CBA are crucial considerations for courts evaluating

whether the RLA preempts a particular claim. *Monroe v. Missouri Pac. R. Co.*, 115 F.3d 514, 519 (7th Cir. 1997).

But these two crucial considerations do not preclude all claims that involve the CBA. Indeed, if the CBA is merely relevant, but not dispositive, to the claim, then judicial resolution is not precluded. *Brown*, 254 F.3d at 668. And generally, "the RLA does not require arbitration of claims asserting rights established by state or federal law independent of a [CBA]." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 833 (7th Cir. 2014).

Here, the CBA's seniority rule states that if an employee's position is abolished, then he or she may displace a more junior employee by following the procedure and requirements set forth in Rule 13 of the CBA. R. 64-31. Hoffstead argues that, by its terms, the seniority rules did not apply to his circumstance and, by forcing Hoffstead to exercise his seniority rights, Metra discriminated against him. Hoffstead also argues that Metra further discriminated against him by rejecting his exercises of seniority. Metra argues that the RLA precludes us from reaching either of Hoffstead's arguments.

We find *Carlson* instructive here. In that case, the plaintiff, Carlson, claimed that, among other things, the defendant, CSX Transportation, Inc. ("CSX"), discriminated against her when it selected other, unqualified individuals for substitute yardmaster positions. *Carlson*, 758 F.3d at 823–24. CSX argued that the RLA precluded resolution of Carlson's claims because they "could be conclusively resolved by an arbitral ruling that she was not qualified under the collective bargaining agreement to be a substitute yardmaster." *Id.* at 833. This court disagreed, explaining that "[e]ven if Carlson did not have the qualifications specified in the collective bargaining

agreement, she would still have viable Title VII claims if, as she alleges, the same potentially disqualifying attributes have been overlooked for men or for others who have not complained about discrimination." *Id.*

The same is true here. Even if the CBA justified Metra's actions, the question is whether Metra undertook its course of action because of Hoffstead's disability. *Monroe*, 871 at 503–04. "[A]n employer cannot ensure the preclusion of a plaintiff's claim merely by asserting certain CBA-based defenses to what is essentially a non-CBA-based claim [. . .] or by arguing that the action challenged by the plaintiff is 'arguably justified' by the terms of a CBA." *Brown*, 254 F.3d at 668 (internal citation omitted) (quoting *Haw. Airlines*, 512 U.S. at 265–66).

But Hoffstead falls short in creating a genuine issue of material fact that Metra applied the seniority rules to him and rejected his exercises of seniority because of his disability. Even though the district court thought itself precluded by the RLA, we review the district court's determination *de novo*, and "[w]e may affirm on any ground supported in the record so long as it was adequately addressed below and the plaintiff[] had an opportunity to contest the issue." *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). Here, Hoffstead has failed to articulate a link between his disability and Metra's actions. Indeed, instead of pointing to evidence that Metra applied the seniority provisions of the CBA to him discriminatorily, Hoffstead argues that "the other circumstantial evidence of adverse actions" in combination with the seniority rule's application to Hoffstead "created a convincing mosaic of unlawful discrimination." Hoffstead Reply Br. at 12; *but see Ortiz*, 834 F.3d at 765 ("Today we reiterate that 'convincing mosaic' is not a legal test."). The "other circumstantial

No. 23-3420 17

evidence" to which Hoffstead refers would not permit a reasonable factfinder to conclude that Hoffstead's disabilities caused Metra's actions. *Ortiz*, 834 F.3d at 765. Indeed, as with Metra's other alleged adverse actions, the impetus was Hoffstead's failure to respond to the MRO and his choice to participate in the Rehabilitation/Education program.

## IV.

For the above reasons, the judgment of the district court is AFFIRMED.